*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
April 25, 2024

Plaintiff-Appellee,

v

No. 361364
Ingham Circuit Court
LC No. 21-000407-FC

JAYLIN JAMES BOWERS,

Defendant-Appellant.

Before: M. J. KELLY, P.J., and JANSEN and MURRAY, JJ.

PER CURIAM.

Defendant appeals as of right his jury-trial convictions of second-degree murder, MCL 750.317;[1] felon in possession of a firearm (felon-in-possession), MCL 750.224f; carrying a concealed weapon (CCW), MCL 750.227; assault with a dangerous weapon (felonious assault), MCL 750.82; and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. Defendant was sentenced to serve 360 to 880 months' imprisonment for his second-degree murder conviction, 36 to 60 months' imprisonment for his felon-in-possession conviction, 36 to 60 months' imprisonment for his CCW conviction, 28 to 40 months' imprisonment for his felonious-assault conviction, and two years' imprisonment for his felony-firearm conviction. We affirm.

## I. BACKGROUND FACTS AND PROCEDURAL HISTORY

Defendant's convictions arise out of the fatal shooting of the victim, Thomas Collins III, and defendant pointing his gun at the victim's father, Thomas Collins II. This case involves a twisted web of relationships that ultimately resulted in the death of the victim. Defendant was in

---

[1] Defendant was charged with, and tried on, a count of first-degree premeditated murder, MCL 750.316(1)(a), but was acquitted of that charge and convicted of the lesser included offense of second-degree murder.

a relationship with Courtney Ramont. Ramont grew up with the victim, so she knew him well. Ramont had a child with Enrique "Ricky" Castillo. The victim was friends with Castillo.

When Castillo discovered defendant and Ramont were dating, he became jealous and upset. On one occasion, Castillo and two other individuals jumped defendant and severely beat him up. Defendant and Ramont decided to move to South Carolina for a month thereafter. On returning, Ramont began proceedings to get custody of her children. Defendant was concerned because Castillo made specific threats related to defendant being around Castillo's child. Once back in Michigan, defendant, who was unable to legally purchase a gun, pressured Ramont to do so. She ultimately agreed and bought a Smith and Wesson handgun.

Two days before the fatal shooting, defendant and Ramont were alerted of someone throwing a rock through Ramont's window. Ramont's surveillance cameras only showed the person running away. The person ran toward the victim's house, though Ramont was certain the person was not the victim. Defendant apparently disagreed. On the day of the shooting, defendant took the gun from Ramont's house, met up with his cousin, Alicia Mireles-Limones, and began driving around in her white sports utility vehicle (SUV). Defendant then sent a Facebook message to the victim, saying he planned to fight the victim. The victim responded by saying he was prepared to fight.

Defendant drove the white SUV to an area on the street near the victim's and Ramont's houses. The victim met defendant in the street, and they began arguing. Adam Horner, who was Mireles-Limones's friend, was parked behind the white SUV at the time. Horner pulled forward and asked defendant if everything was okay. Defendant said it was. Horner testified defendant seemed calm. Shortly afterward, though, defendant shot the victim three times, ultimately causing his death. Collins II, who was inside his home, heard the gunshots and rushed outside. He shouted at defendant as he was walking back to the white SUV, and defendant turned around and pointed his gun at Collins II. Defendant turned back around and got in the vehicle after Collins II started rendering aid to the victim.

Defendant drove the white SUV to the home of his other cousin, Mireles-Limones's sister, Shawnee Mireles-Santiago. He parked it in the backyard. Defendant deleted the Facebook messages he sent to the victim, posted new threatening Facebook comments to Castillo, and searched the internet for how long gun residue would stay on his hands. Defendant was eventually arrested, though he initially refused to follow the officers' commands. He was found with the Smith and Wesson handgun, which was forensically determined to have fired the three shell casings found at the scene of the crime. A second handgun, this one a Taurus, also was found with defendant. During a voluntary interrogation, defendant repeatedly lied to the police.

Defendant was charged as noted above. His theory at trial was self-defense. Defendant claimed the victim was the aggressor in the situation, brandished a handgun as soon as he began speaking with defendant, and pointed the gun at defendant before defendant finally shot. Defendant relied on the Taurus handgun having the victim's DNA on it, Horner overhearing defendant telling the victim to calm down, and expert testimony about the level of methamphetamine in the victim's blood. Additionally, Mireles-Santiago testified she observed the incident via a video call from Mireles-Limones. Mireles-Santiago supported defendant's story.

Defendant also claimed he feared for his life when Collins II shouted at him, which caused defendant to turn and point his gun.

At the close of proofs, defendant requested the trial court instruct the jury with respect to voluntary and involuntary manslaughter as the lesser included offenses of murder. The trial court declined, reasoning the instructions were not supported by the evidence. The jury ultimately disbelieved defendant's claim of self-defense and convicted him. Defendant was sentenced, and this appeal followed.

While this appeal was pending, defendant moved the trial court to award him a new trial. Defendant asserted his second-degree murder and felonious-assault convictions were against the great weight of the evidence and that he was denied a fair trial because of prosecutorial misconduct.[2] The trial court disagreed and denied the motion. The case is now before us for plenary review.

## II. JURY INSTRUCTIONS

Defendant argues the trial court erred by denying his request for jury instructions related to voluntary and involuntary manslaughter as lesser included offenses of murder. We disagree.

## A. STANDARD OF REVIEW

"Claims of instructional error are reviewed de novo." *People v Montague*, 338 Mich App 29, 37; 979 NW2d 406 (2021). "This Court reviews the trial court's determination whether a jury instruction is applicable to the facts of the case for an abuse of discretion." *Id*. (quotation marks and citation omitted). "An abuse of discretion occurs when the trial court's decision is outside the range of principled outcomes." *Id*. (quotation marks and citation omitted).

## B. LAW AND ANALYSIS

The trial court did not err when it declined to instruct the jury on voluntary and involuntary manslaughter as lesser included offenses of murder. "A criminal defendant has the right to have a properly instructed jury consider the evidence against him." *People v Ogilvie*, 341 Mich App 28, 34; 989 NW2d 250 (2022) (quotation marks and citation omitted). "[T]he trial court is required to instruct the jury concerning the law applicable to the case and fully and fairly present the case to the jury in an understandable manner." *Montague*, 338 Mich App at 37 (quotation marks and citation omitted; alteration in original). In other words, "[o]ne of the essential roles of the trial court is to present the case to the jury and to instruct it on the applicable law with instructions that include . . . any material issues, defenses, and theories that are supported by the evidence." *People v Craft*, 325 Mich App 598, 606-607; 927 NW2d 708 (2018) (quotation marks and citation omitted). "Further, when a jury instruction is requested on any theories or defenses and is

---

[2] We employ the phrase "prosecutorial misconduct" as a term of art synonymous with "prosecutorial error," not as an indication that the prosecution engaged in intentional misconduct. *People v Jackson (On Reconsideration)*, 313 Mich App 409, 425 n 4; 884 NW2d 297 (2015).

supported by evidence, it must be given to the jury by the trial judge." *People v Mills*, 450 Mich 61, 81; 537 NW2d 909 (1995), mod 450 Mich 1212 (1995).

Our Supreme Court has explained "that a defendant is entitled to a lesser offense instruction only if that lesser offense is necessarily included in the greater offense[.]" *People v Jones*, 497 Mich 155, 164; 860 NW2d 112 (2014). "Necessarily included lesser offenses are offenses in which the elements of the lesser offense are completely subsumed in the greater offense." *People v Nickens*, 470 Mich 622, 626; 685 NW2d 657 (2004) (quotation marks and citation omitted). As to whether such an instruction should be given, our Supreme Court stated, "a requested instruction on a necessarily included lesser offense is proper if the charged greater offense requires the jury to find a disputed factual element that is not part of the lesser included offense and a rational view of the evidence would support it." *People v Cornell*, 466 Mich 335, 357; 646 NW2d 127 (2002).

"Failure to instruct on a lesser included offense undermines reliability in the verdict only 'when the evidence "clearly" supports the lesser included instruction, but the instruction is not given.' " *People v Everett*, 318 Mich App 511, 529; 899 NW2d 94 (2017), quoting *Cornell*, 466 Mich at 365. "In analyzing whether the evidence 'clearly' supports the instruction, we must consider the 'entire cause,' including evidence that has been offered to support the greater offense." *Everett*, 318 Mich App at 529, quoting *Cornell*, 466 Mich at 365.

## 1. INVOLUNTARY MANSLAUGHTER

Defendant asserts the trial court erred when it failed to read M Crim JI 16.11 upon his request. As explained by our Supreme Court when addressing a previous version of this jury instruction, it is associated with the crime of statutory involuntary manslaughter, MCL 750.329. *People v Heflin*, 434 Mich 482, 496-497; 456 NW2d 10 (1990).

> The elements of statutory involuntary manslaughter are as follows: (1) a death, (2) the death was caused by an act of the defendant, (3) the death resulted from the discharge of a firearm, (4) at the time of the discharge, the defendant was intentionally pointing the firearm at the victim, and (5) the defendant did not have lawful justification or excuse for causing the death. [*People v Smith*, 478 Mich 64, 70; 731 NW2d 411 (2007).]

The jury instruction requested by defendant, M Crim JI 16.11, states:

> (1) [The defendant is charged with the crime of _____ / You may also consider the lesser charge of] involuntary manslaughter. To prove this charge, the prosecutor must prove each of the following elements beyond a reasonable doubt:

> (2) First, that the defendant caused the death of [*name deceased*], that is, [*name deceased*] died as a result of [*state alleged act causing death*].

> (3) Second, that death resulted from the discharge of a firearm. [A firearm is an instrument from which (shot/a bullet) is propelled by the explosion of gunpowder.]

> (4) Third, at the time the firearm went off, the defendant was pointing it at [*name deceased*].

(5) Fourth, at that time, the defendant intended to point the firearm at [*name deceased*].

[(6) Fifth, that the defendant caused the death without lawful excuse or justification.]

As defendant identifies in his own brief, the outcome of this issue has already been decided by our Supreme Court's decision in *Smith*, 478 Mich at 74. In that case, the Court considered whether statutory involuntary manslaughter was a lesser included offense of murder. *Id*. at 66. During trial, when instructing the jury, the trial court refused to instruct on statutory involuntary manslaughter despite the defendant's request for such. *Id*. at 67. The defendant appealed, arguing that the trial court erred because the facts supported the instruction. *Id*. at 68. The Court reasoned that the defendant was asking the wrong question because, whether or not the facts would support the instruction, the trial court did not err in refusing to give it because statutory involuntary manslaughter is not a lesser included offense of second-degree murder. *Id*. at 69-71. Our Supreme Court provided the following explanation:

> Comparing the elements of these offenses, we conclude that statutory involuntary manslaughter under MCL 750.329 is not a necessarily included lesser offense of second-degree murder because it is not an "inferior" offense under MCL 768.32(1). It is plain that the elements of statutory involuntary manslaughter are not completely subsumed in the elements of second-degree murder. Statutory involuntary manslaughter contains two elements that are not required to prove second-degree murder: (1) that the death resulted from the discharge of a firearm and (2) that the defendant intentionally pointed a firearm at the victim. Second-degree murder, on the other hand, may be committed without a firearm or even without a weapon of any kind. Because it is possible to commit second-degree murder without first committing statutory involuntary manslaughter, statutory involuntary manslaughter cannot be a necessarily included lesser offense of second-degree murder. [*Smith*, 478 Mich at 71.]

As a result, the Court affirmed the defendant's conviction of second-degree murder, holding an instruction for statutory involuntary murder was not permitted under relevant law. *Id*. at 74.

In the present case, like in *Smith*, defendant was charged with murder, not statutory involuntary manslaughter. Defendant urged the trial court to read the instruction for statutory involuntary manslaughter as a lesser included offense of murder, but the trial court refused. For the same reasons discussed in *Smith*, the trial court did not err in doing so. Indeed, the trial court was not permitted to give the instruction, regardless of the facts of the case, in light of the Court's decision in *Smith*, *id*. at 71. Rather than attempt to distinguish *Smith*, defendant contends it was wrongly decided, and cites *People v Holtschlag*, 471 Mich 1; 684 NW2d 730 (2004), and *People v Mendoza*, 468 Mich 527; 664 NW2d 685 (2003), to support his argument.

First, it is not the province of this Court to determine whether a decision of our Supreme Court was wrongly decided. *People v Czarnecki (On Reconsideration and Remand)*, ___ Mich App ___, ___; ___ NW3d ___ (2023) (Docket No. 348732); slip op at 3 ("The Court of Appeals is bound to follow decisions by [our Supreme] Court except where those decisions have clearly

been overruled or superseded and is not authorized to anticipatorily ignore our decisions where it determines that the foundations of a Supreme Court decision have been undermined.") (quotation marks, citation, and emphases omitted). If defendant believes *Smith* was wrongly decided, his dispute is with our Supreme Court. *Id*. Second, the Court in *Smith* specifically determined its decision was consistent with *Holtschlag* and *Mendoza*. The *Smith* Court recognized the decision in *Mendoza*, 468 Mich at 540-541, related to common-law involuntary manslaughter, which is different than statutory involuntary manslaughter. *Smith*, 478 Mich at 73-74. Further, the Court in *Smith* also stated: "Our holding is consistent with [] *Holtschlag*, 471 Mich [at] 21-22[.]" *Smith*, 478 Mich at 71. Defendant's grounds for claiming the decision in *Smith* was incorrect have already been considered by our Supreme Court and found to lack merit. *Id*. at 71, 73-74. Because *Smith* is controlling, and we are bound to follow it, *Czarnecki*, ___ Mich App at ___; slip op at 3, defendant's claim of error related to an instruction for statutory involuntary manslaughter lacks merit.

## 2. VOLUNTARY MANSLAUGHTER

Next, defendant contends the trial court erred when it denied his request for the jury to be instructed on voluntary manslaughter, M Crim JI 16.9, as a lesser included offense of murder. This argument does not suffer from the same fatal error as above because voluntary manslaughter is a lesser included offense of murder. *Smith*, 478 Mich at 73 ("In *Mendoza*, we applied the *Cornell* test and concluded that common-law manslaughter under MCL 750.321, either voluntary or involuntary, is an 'inferior' offense of murder."). "Both murder and voluntary manslaughter require a death, caused by defendant, with either an intent to kill, an intent to commit great bodily harm, or an intent to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result." *People v Yeager*, 511 Mich 478, 489; 999 NW2d 490 (2023) (quotation marks and citation omitted). "The distinguishing element is malice, which in voluntary manslaughter is 'negated by the presence of provocation and heat of passion.' " *Id*. at 489-490, quoting *Mendoza*, 468 Mich at 540. Stated differently, "[m]anslaughter is murder without malice." *Mendoza*, 468 Mich at 534.

"The elements of voluntary manslaughter are: (1) the defendant must kill in the heat of passion, (2) the passion must be caused by an adequate provocation, and (3) there cannot be a lapse of time during which a reasonable person could control his passions." *People v McMullan*, 284 Mich App 149, 156; 771 NW2d 810 (2009), aff'd 488 Mich 922 (2010) (quotation marks and citation omitted). "The provocation necessary to mitigate a homicide from murder to manslaughter is that which causes the defendant to act out of passion rather than reason." *People v Sullivan*, 231 Mich App 510, 518; 586 NW2d 578 (1998), aff'd 461 Mich 992 (2000). "Case law has consistently held that the provocation must be adequate, namely, that which would cause a reasonable person to lose control." *Id*. (emphasis omitted).

Defendant argues there was adequate provocation because the victim brandished a gun, repeatedly made moves that suggested he was reaching for it, and began pointing the gun at defendant. The parties do not generally dispute that this was adequate provocation by the victim. Indeed, such an argument likely would lack merit. See *Yeager*, 511 Mich at 491-492 (holding an abusive husband threatening to kill his wife, while taking steps to achieve it, was enough proof of adequate provocation to warrant a voluntary-manslaughter instruction). Instead, the parties disagree regarding whether there was sufficient evidence of defendant acting as a result of passion

instead of reason. *Sullivan*, 231 Mich App at 518. When considering the request for the instruction, the trial court noted all of the witnesses said defendant was calm before he shot the victim. The trial court concluded there was no evidence to support a claim that defendant acted in the heat of passion.

There were three witnesses who testified that they observed all or almost all of the altercation between defendant and the victim. Horner testified he specifically asked defendant if he was okay, and defendant said he was. This was after Horner observed the victim acting in an agitated fashion and reaching toward his waistband. Horner believed the victim's motion indicated he was reaching for a gun. Even so, Horner testified defendant appeared calm. Mireles-Santiago testified she observed the altercation via a video call with Mireles-Limones. Mireles-Santiago stated the victim appeared high on drugs and was acting bizarrely. To the contrary, she described defendant as "not aggressive," and "straightforward." Mireles-Santiago testified defendant did not fire his gun until the victim began pointing his gun at defendant. Mireles-Santiago did not otherwise speak about defendant's behavior or emotional state leading up to and during the shooting.

Defendant was the last witness who testified about his state of mind when he shot and killed the victim. Defendant stated the victim brandished his gun as soon as he walked up to defendant's window. Defendant's response was to tell the victim "hold on," and "I'm not tryin' to do that." Defendant asked about the rock thrown through Ramont's window, and the victim responded he did not know anything about it. Defendant testified he was fine with that answer, and was prepared to drive away. However, he noticed the victim getting more upset and reaching toward his gun. As the victim backed away, defendant testified he thought: "What's that all about?" When the victim made it clear he was considering using his gun, defendant testified about his reaction in the following manner: "That's when I put the car in park, reached for the gun, put it on the window, and I said, 'Bro, don't do it. You're not the only one carrying.' "

Defendant then exited the vehicle, while repeatedly telling the victim not to use the gun, encouraging him to just drop it, and saying they could end the argument. Defendant said he thought the victim was "tryin' to play it off" and "tryin' to be slick." Defendant testified he was reading the victim's body language while continuing to request an end to the altercation. "Then he upped on me just like this. That's when I fired off three rounds." When the victim pulled out the gun, defendant thought "my life is on the line right now[.]" As the victim backed away and looked around, defendant suspected the victim was looking for some assistance. When asked why he fired his gun, defendant stated: "Because I was in immediate danger of my life." On cross-examination, defendant testified he was "calm, cool, and collect[ed]" during the altercation. Indeed, defendant stated he thought about driving away from the dispute, but realized the road was too slippery, which could cause his tires to slip and provide the opportunity for the victim to shoot. Defendant testified he initially "froze" when the victim became more belligerent, but began to act when the victim pulled out his gun.

The relevant testimony missing from above is that defendant acted in the heat of passion. In other words, although defendant claimed he believed his life was on the line, he never said he acted because of his emotions instead of reason. Defendant's testimony was clear—he reasoned he could not drive away because his tires might slip, he reasoned he had to get out his gun because the victim was brandishing his gun, he reasoned he had to put the car in park and get out to better

deal with the victim, and then he reasoned he had to fire his gun when the victim was preparing to shoot. Horner testified that defendant was calm, and Mireles-Santiago did not provide significant testimony about defendant's apparent emotions. The only reasonable inference available from this evidence was that defendant acted as a result of reason and not passion. As this Court has explained, the reasonable provocation must "cause[] the defendant to act out of passion rather than reason." *Sullivan*, 231 Mich App at 518. Stated differently, there was no substantive evidence that defendant acted in the heat of passion. *McMullan*, 284 Mich App at 156. While defendant undoubtedly was in a stressful situation, which could potentially cause someone to act out of extreme fear instead of reason, defendant simply did not do so.

To make the point clearer, a review of testimony from *Yeager* is particularly enlightening. As noted, in that case, the defendant claimed there was evidence of voluntary manslaughter because her husband threatened to kill her and took steps to do so. *Yeager*, 511 Mich at 491-492. When determining a voluntary-manslaughter instruction was warranted by the evidence, our Supreme Court relied heavily on the following testimony of the defendant: " 'I just remembered bein' scared. I don't remember details, like, walkin' towards him, or anything like that. And when I seen the video, I didn't even see myself, or remember shootin' as many times as they say I did.' " *Id*. at 492. On the basis of this testimony, along with the evidence of adequate provocation, the Court concluded a reasonable juror could have found the defendant "acted out of heightened emotion rather than reason in shooting" the victim. *Id*.

The difference between the two states of mind of defendant in the present case and the defendant in *Yeager* are stark. Defendant described being calm and other witnesses agreed. He recalled all of his actions and could explain his specific reasons for performing them. The defendant in *Yeager* was foggy on the details and could only remember feelings instead of reasoning. The testimony of the defendant in *Yeager* showed she acted out of passion; defendant's testimony in the present case established he acted out of calculated reasoning. As a result, the record supported an instruction for voluntary manslaughter in *Yeager*, but does not in the present case. Because a rational view of the evidence did not support that defendant acted out of passion instead of reason, the trial court did not err when it refused to instruct the jury regarding voluntary manslaughter. *Cornell*, 466 Mich at 357; *Sullivan*, 231 Mich App at 518.

### III. SUFFICIENCY AND GREAT WEIGHT OF THE EVIDENCE

Defendant challenges both the sufficiency of the evidence and the great weight of the evidence related to his second-degree-murder and felonious-assault convictions. We disagree on both accounts.

### A. STANDARDS OF REVIEW

"We review de novo a challenge on appeal to the sufficiency of the evidence." *People v Henry*, 315 Mich App 130, 135; 889 NW2d 1 (2016) (quotation marks and citation omitted). "To determine whether the prosecutor has presented sufficient evidence to sustain a conviction, we review the evidence in the light most favorable to the prosecutor and determine 'whether a rational trier of fact could find the defendant guilty beyond a reasonable doubt.' " *People v Smith-Anthony*, 494 Mich 669, 676; 837 NW2d 415 (2013), quoting *People v Tennyson*, 487 Mich 730, 735; 790 NW2d 354 (2010). "The standard of review is deferential: a reviewing court is required to draw

all reasonable inferences and make credibility choices in support of the jury verdict." *People v Bailey*, 310 Mich App 703, 713; 873 NW2d 855 (2015) (quotation marks and citation omitted). "We review for an abuse of discretion a trial court's grant or denial of a motion for a new trial on the ground that the verdict was against the great weight of the evidence." *People v Lacalamita*, 286 Mich App 467, 469; 780 NW2d 311 (2009). "An abuse of discretion occurs when a trial court chooses an outcome falling outside the range of reasonable and principled outcomes." *Id*.

## B. LAW AND ANALYSIS

### 1. SUFFICIENCY OF THE EVIDENCE

There was sufficient evidence to sustain defendant's convictions of second-degree murder and felonious assault. There is sufficient evidence for a guilty verdict where "a rational trier of fact could find the defendant guilty beyond a reasonable doubt." *Tennyson*, 487 Mich at 735 (quotation marks and citation omitted). "The prosecution need not negate every reasonable theory of innocence; instead, it need only prove the elements of the crime in the face of whatever contradictory evidence is provided by the defendant." *People v Mikulen*, 324 Mich App 14, 20; 919 NW2d 454 (2018). "Circumstantial evidence and the reasonable inferences that arise from that evidence can constitute satisfactory proof of the elements of the crime." *People v Blevins*, 314 Mich App 339, 357; 886 NW2d 456 (2016). Any and all conflicts that arise in the evidence must be resolved "in favor of the prosecution." *Mikulen*, 324 Mich App at 20. "It is for the trier of fact, not the appellate court, to determine what inferences may be fairly drawn from the evidence and to determine the weight to be accorded those inferences." *People v Hardiman*, 466 Mich 417, 428; 646 NW2d 158 (2002). "Because of the difficulty in proving an actor's intent, only minimal circumstantial evidence is necessary to show that a defendant had the requisite intent." *People v Stevens*, 306 Mich App 620, 629; 858 NW2d 98 (2014).

Defendant challenges the sufficiency of the evidence for his conviction of second-degree murder. "The elements of second-degree murder are (1) a death, (2) caused by an act of the defendant, (3) with malice, and (4) without justification or excuse." *People v Wafer*, 509 Mich 31, 40; 983 NW2d 315 (2022) (quotation marks and citation omitted). "Malice is defined as the intent to kill, the intent to cause great bodily harm, or the intent to do an act in wanton and willful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm." *People v Baskerville*, 333 Mich App 276, 284; 963 NW2d 620 (2020) (quotation marks and citation omitted). "Malice for second-degree murder can be inferred from evidence that the defendant intentionally set in motion a force likely to cause death or great bodily harm." *People v Fletcher*, 260 Mich App 531, 559; 679 NW2d 127 (2004) (quotation marks and citations omitted). "Second-degree murder is a general intent crime." *Id*.

Defendant, however, does not challenge the prosecution's evidence supporting the proofs of second-degree murder. Instead, defendant contends there was insufficient evidence for a reasonable juror to believe defendant did not act in self-defense. "A killing may be considered justified if the defendant acts in self-defense." *People v Bailey*, 330 Mich App 41, 46; 944 NW2d 370 (2019). "Once a defendant raises the issue of self-defense and 'satisfies the initial burden of producing some evidence from which a jury could conclude that the elements necessary to establish a prima facie defense of self-defense exist,' the prosecution must 'exclude the possibility' of self-defense beyond a reasonable doubt." *Stevens*, 306 Mich App 630, quoting *People v Dupree*,

486 Mich 693, 709-710; 788 NW2d 399 (2010). Self-defense, when proven, can excuse criminal behavior, "usually the killing of another person, if the defendant honestly and reasonably believes his life is in imminent danger or that there is a threat of serious bodily harm and that it is necessary to exercise deadly force to prevent such harm to himself." *Dupree*, 486 Mich at 707 (quotation marks and citation omitted). "With the enactment of the Self-Defense Act (SDA), MCL 780.971 *et seq*., the Legislature codified the circumstances in which a person may use deadly force in self-defense or in defense of another person without having the duty to retreat." *Id*. at 708. The relevant provision of that statute, MCL 780.972(1)(a), states:

> (1) An individual who has not or is not engaged in the commission of a crime at the time he or she uses deadly force may use deadly force against another individual anywhere he or she has the legal right to be with no duty to retreat if either of the following applies:
>
> (a) The individual honestly and reasonably believes that the use of deadly force is necessary to prevent the imminent death of or imminent great bodily harm to himself or herself or to another individual.

Defendant asserts he was justified in using deadly force because he honestly and reasonably believed his life was in danger. Defendant notes there was testimony from Mireles-Santiago, Horner, and defendant that the victim was behaving bizarrely and speaking aggressively. All three witnesses testified defendant repeatedly told the victim to stop. Defendant and Mireles-Santiago recalled defendant specifically telling the victim to stop reaching for a gun. Defendant and Mireles-Santiago both testified the victim pointed a gun at defendant before defendant fired his own gun. The victim was found to have methamphetamine in his system, which Dr. Robert Belloto testified could cause the victim to act in a particularly aggressive or assaultive manner. Further, the victim's DNA was found on the Taurus handgun. Defendant insists that, in light of such evidence, no reasonable juror could have believed defendant did not act in self-defense.

Defendant's argument, of course, ignores all of the evidence suggesting defendant did not act in self-defense when he shot and killed the victim. Recall that, when considering a claim related to the sufficiency of the evidence, we must "review the evidence in the light most favorable to the prosecutor and determine 'whether a rational trier of fact could find the defendant guilty beyond a reasonable doubt.' " *Smith-Anthony*, 494 Mich at 676, quoting *Tennyson*, 487 Mich at 735. Defendant's argument effectively urges us to do the opposite. When viewing the evidence in the light most favorable to the prosecution, it is clear there was sufficient evidence for a reasonable juror to determine that defendant did not shoot the victim in self-defense.

First, evidence of defendant's behavior before the shooting indicated he had a motive to kill the victim. Defendant was attacked by Castillo and his cohorts two months before the shooting. Defendant was aware the victim was friends with Castillo, and Ramont testified defendant was angry and upset after being beaten up. Defendant's injuries required treatment in the hospital. After spending about a month in South Carolina, defendant and Ramont moved back to Lansing. The threatening messages from Castillo continued when they returned. Defendant told Ramont she needed to put security cameras on her home and then buy a gun. A reasonable juror could infer that defendant wanted Ramont to buy the gun so defendant could use it. After all, defendant

-10-

twice pressed Ramont to purchase a gun, and then remained in contact with her while she was in the store. Defendant was legally unable to purchase a gun himself.

Also before the shooting, defendant became aware of someone throwing a rock through Ramont's window. When watching the video, it was clear the person running away from Ramont's home was running toward the victim's home. Defendant even testified that he thought the person throwing the rock might have been the victim, who was a known friend of Castillo. Given defendant's anger at Castillo and his newfound belief that the victim was involved in the dispute, a reasonable juror could infer defendant had motive to kill or harm the victim. On the basis of that inference, the jury could have concluded that defendant entered the altercation with an intent to kill the victim or to cause him great bodily harm, which weighs against defendant's claim of self-defense. *People v Unger*, 278 Mich App 210, 223; 749 NW2d 272 (2008) (reasoning that given "the difficulty of proving an actor's state of mind, minimal circumstantial evidence is sufficient to establish a defendant's intent," and such can include evidence of motive).

Additional evidence weighing against defendant's claim of self-defense was defendant's actions in goading the victim into an altercation. The record showed defendant sent the victim messages on Facebook, effectively threatening to harm him, and then telling the victim to come out of his house. Defendant did these things with the above-mentioned motive and while in the possession of a handgun. From this evidence, a reasonable juror could infer that defendant sought to get the victim out of his house so he could kill him or cause him great bodily harm, which allows for a finding that defendant did not act in self-defense. See *Bailey*, 310 Mich App at 713 (holding that this Court is "required to draw all reasonable inferences and make credibility choices in support of the jury verdict.") (quotation marks and citation omitted).

Second, the jury could have inferred that defendant did not act in self-defense from his actions during the altercation with the victim. According to Dr. David Moons, who performed the victim's autopsy, the victim was shot three times, one of which was a graze wound to the victim's abdomen. The other two shots, which were fatal, struck the side of the victim's left hip toward the rear. Dr. Moons stated it was unlikely the entry wounds of those two shots were caused by ricocheting bullets. On the basis of Dr. Moons's testimony and the photographs of the entry wounds on the victim's hip, the jury was well-supported in concluding that defendant shot at the victim's body. Further, given that the entry wounds were on the side of the victim's hip, the jury also could have concluded that the victim was attempting to get away from defendant when he fired his gun. After all, if the victim was actively preparing to shoot defendant, as claimed, it would be more likely the bullet wounds would be on the front of the victim's body. While defendant attempted to explain why he shot the victim's side, the jury was permitted to disbelieve him. "A jury is free to believe or disbelieve, in whole or in part, any of the evidence presented." *Baskerville*, 333 Mich App at 283 (quotation marks, citation, and brackets omitted). Considering the evidence discussed, and drawing the inferences in favor of the jury's verdict, as we must, there was sufficient evidence for the jury to find that defendant purposefully shot the victim's body while he was trying to get away. *Bailey*, 310 Mich App at 713. Such a finding plainly would weigh against a finding of self-defense.

As noted, defendant relies on his, Horner's, and Mireles-Santiago's testimony that the victim was the aggressor. Horner thought the victim made motions as if to reach for a gun, while defendant and Mireles-Santiago said they actually saw the victim draw a weapon. Defendant also

notes the victim's DNA was on the Taurus handgun. As for the witnesses' testimony cited by defendant, simply put, his reliance on it is misplaced because the jury was permitted to disbelieve it. *Baskerville*, 333 Mich App at 283. Given the other evidence discussed above, there was good reason for the jury to conclude that defendant confronted the victim with the intent to harm or kill him. This provided grounds for the jury to disbelieve that the victim was the aggressor in the situation, and ultimately, to disbelieve defendant's claim of self-defense. *Id.*; *Bailey*, 310 Mich App at 713 (holding this Court is "required to draw all reasonable inferences and make credibility choices in support of the jury verdict.") (quotation marks and citation omitted).

Third, and finally, defendant's behavior after the shooting supported the jury's decision that defendant did not shoot the victim in self-defense. Immediately after defendant fatally shot the victim, he picked up the victim's gun and took it with him. Given that the victim's cell phone was never found, and he at least had it when he texted Collins II about 45 minutes before the shooting, a reasonable juror could have inferred that defendant also took the victim's cell phone. When defendant returned to Mireles-Santiago's house, he parked Mireles-Limones's white SUV in the backyard instead of the driveway. A juror could infer he did this to hide the vehicle from someone searching for the person who shot and killed the victim.

While inside, defendant deleted his Facebook conversation with the victim, which included defendant's overt threats and goading the victim to leave his house right before he was shot and killed. Because the victim's cell phone was never found, a reasonable juror could have inferred that defendant destroyed it in some manner. Defendant also did not take steps to give the victim's gun to police, which permitted an inference that he planned to dispose of it. Further, defendant used his cell phone to search the internet for how long gun residue would stay on his hands, which indicated he was looking for a way to wash away the physical evidence of his crime. All of the above evidence showed that defendant was attempting to hide or destroy evidence of the victim's killing, and a defendant's "effort to destroy evidence of the crime of murder," can be used to show "a consciousness of guilt." *People v Sharpe*, 319 Mich App 153, 172-173; 899 NW2d 787 (2017), aff'd on other grounds 502 Mich 313 (2018) (quotation marks and citation omitted). All of this evidence weighed against defendant's claim of self-defense.

The record evidence also revealed defendant did not go to police to report that he shot someone in self-defense. Instead, defendant went to Mireles-Santiago's house, hid Mireles-Limones's vehicle, and used the internet to search information about the shooting. When he was finally found by police, he was getting into Horner's vehicle. A reasonable juror could have determined that defendant was preparing to flee the area. Further, when police instructed him to exit Horner's vehicle, defendant initially refused. An officer on the scene testified that he thought defendant was looking for an avenue to run away from the police. All of this evidence showed that defendant fled from police and was preparing to flee a greater distance. "Defendant's flight is relevant circumstantial evidence of his consciousness of guilt." *Craft*, 325 Mich App at 612. Consequently, the evidence of defendant's flight weighed against his claim that he acted in self-defense.

Additionally, before he was arrested, defendant accessed Facebook and made threats to Castillo. Defendant effectively told Castillo he had made a mistake in attacking defendant, and defendant would not allow himself to be harmed further. Defendant then threatened Castillo, telling him to try to attack defendant again and see what happened. Lastly, and most importantly,

defendant wrote he would take care of Castillo "one by one." This permitted a reasonable juror to infer that defendant was acknowledging he had killed the victim, one of Castillo's friends, and he was prepared to kill Castillo and all of his other cohorts, one by one. While defendant insisted "one by one," should have said "one on one," the jury was free to disbelieve his testimony, and instead believe the actual text defendant wrote. *Baskerville*, 333 Mich App at 283. Further, defendant's inferred threat to continue killing Castillo, and the other men involved with him, permitted an inference defendant purposely killed the victim, who was a known friend of Castillo. As a result, this evidence also weighed against defendant's claim of self-defense.

Lastly, when he was being arrested, defendant claimed the police had the wrong man. He lied and said another person was hiding in Horner's vehicle. When defendant finally submitted to the arrest, he was taken to the police station where he voluntarily participated in an interrogation. Defendant then lied to the police again, this time about whether he knew Ramont and that he was out of the state when the victim was killed. "A jury may infer consciousness of guilt from evidence of lying or deception." *People v Kowalski*, 489 Mich 488, 509 n 37; 803 NW2d 200 (2011) (quotation marks and citation omitted). Consequently, defendant's decision to repeatedly lie to police was evidence of his guilt, and weighed against his claim of self-defense. *Id*. at 509 & n 37.

In light of all of the above evidence of defendant's words and behavior before, during, and after he shot and killed the victim, the jury was well-supported in concluding defendant did not shoot in self-defense. In other words, when considering all of the evidence in the light most favorable to the prosecution, we must conclude that the jury acted reasonably when it found defendant guilty of second-degree murder. *Smith-Anthony*, 494 Mich at 676. Because there was sufficient evidence to establish beyond a reasonable doubt all of the elements of second-degree murder, and that defendant did not act in self-defense, his argument fails. *Id*.

Defendant next challenges his conviction of felonious assault. "The crime of felonious assault is defined by MCL 750.82(1), which provides that 'a person who assaults another person with a . . . dangerous weapon without intending to commit murder or to inflict great bodily harm less than murder is guilty of a felony . . . .' " *People v McKewen*, 326 Mich App 342, 352; 926 NW2d 888 (2018) (emphasis omitted; alterations in original). "The elements of felonious assault are (1) an assault, (2) with a dangerous weapon, and (3) with the intent to injure or place the victim in reasonable apprehension of an immediate battery." *People v Jackson*, 487 Mich 783, 787 n 2; 790 NW2d 340 (2010) (quotation marks, citation, and emphasis omitted). Defendant argues that the prosecution did not prove intent beyond a reasonable doubt because his action of turning and pointing his gun at Collins II was involuntary. Our Supreme Court addressed this defense in *People v Likine*, 492 Mich 367, 393-394; 823 NW2d 50 (2012):

> [A]t common law, a defendant could admit that he committed the act, but defend on the basis that the act was committed involuntarily. Examples of involuntary acts that, if proved, provide a defense against the *actus reus* element of a crime include reflexive actions, spasms, seizures or convulsions, and bodily movements occurring while the actor is unconscious or asleep. The common thread running through these "involuntariness" defenses is that the act does not occur under the defendant's control, and thus the defendant was powerless to prevent its occurrence and cannot be held criminally liable for the act. [Citations and emphasis omitted.]

-13-

Defendant claims no reasonable juror could have concluded that he intentionally assaulted Collins II by being shocked into turning around and pointing his gun after Collins II shouted. In other words, defendant asserts his felonious-assault conviction was not supported by sufficient evidence because his actions were involuntary. *Id.* Once again, in presenting this argument, defendant has interpreted the evidence in a light most favorable to him. We must do the opposite, and consider the evidence in a light most favorable to the prosecution. *Smith-Anthony*, 494 Mich at 676. Interestingly, in this case, defendant's argument is defeated by his own testimony. While he did testify that he was startled by Collins II shouting at him, defendant also stated that this caused him to be in fear. This fear, in turn, caused defendant to purposefully turn around and point his gun in the direction of the shout. Defendant testified: " I just had to defend my life. Now somebody else is comin' out talking about 'Hey, motherf***er.' So now I'm defendin'—so I turn around up on him."

Although defendant was surprised, he did not claim that turning around was a form of spasm or uncontrollable reflex, which is the hallmark of the defense now claimed by defendant on appeal. *Likine*, 492 Mich at 393-394. Instead, defendant testified he was concerned for his safety after the altercation with the victim, and grew more concerned when he heard the shout. As a result, defendant thought he needed to protect himself, so he turned around and pointed the gun at Collins II. Simply put, the decision to turn around was a conscious decision according to defendant's own testimony. While there might have been some debate about intent or self-defense, there was no indication on the record that defendant's action was involuntary. *Id.* As a result, this claim by defendant on appeal does not fit with his claimed defense, and his argument must fail. *Id.* In other words, given defendant's own testimony, the jury was well-supported in concluding that defendant acted purposefully and intentionally, not reflexively and involuntarily, when he turned and pointed his gun at Collins II. *Id.*

## 2. GREAT WEIGHT OF THE EVIDENCE

Defendant alternatively claims the jury's verdicts related to second-degree murder and felonious assault were against the great weight of the evidence. Defendant does not provide any other reasons, and only suggests the lower standard for a great-weight argument can be fulfilled even if a sufficiency claim cannot. Defendant is incorrect. "A verdict is against the great weight of the evidence and a new trial should be granted when the evidence preponderates heavily against the verdict and a serious miscarriage of justice would otherwise result." *People v Solloway*, 316 Mich App 174, 182-183; 891 NW2d 255 (2016) (quotation marks and citation omitted). "Generally, a verdict is against the great weight of the evidence only when it was more likely the result of causes outside the record, such as passion, prejudice, sympathy, or some other extraneous influence." *People v Morris*, 314 Mich App 399, 414; 886 NW2d 910 (2016) (quotation marks and citation omitted). "Conflicting testimony, even when impeached to some extent, is an insufficient ground for granting a new trial." *Lacalamita*, 286 Mich App at 469-470 (quotation marks and citation omitted). "[U]nless it can be said that directly contradictory testimony was so far impeached that it was deprived of all probative value or that the jury could not believe it, or contradicted indisputable physical facts or defied physical realities, the trial court must defer to the jury's determination." *People v Lemmon*, 456 Mich 625, 645-646; 576 NW2d 129 (1998) (citation and quotation marks omitted). Thus, "despite any misgivings or inclinations to disagree, [this Court must] leave the test of credibility where our system reposed it—in the trier of the facts." *Id.* at 646 (quotation marks and citation omitted).

As summarized in-depth above, there was significant evidence establishing defendant did not act in self-defense when he shot and killed the victim. The jury decided to believe that evidence, not defendant's claim of self-defense. We must "leave the test of credibility where our system reposed it—in the trier of the facts." *Id.* at 646 (quotation marks and citation omitted). Defendant has not identified any "causes outside the record, such as passion, prejudice, sympathy, or some other extraneous influence," as a reason the jury determined he was guilty despite alleged evidence that preponderated heavily in favor of finding defendant acted in self-defense. *Morris*, 314 Mich App at 414 (quotation marks and citation omitted). Instead, defendant relies on various pieces of evidence that support his claim of self-defense, while ignoring the plethora of facts that suggest defendant intended to kill or seriously injure the victim before the altercation even occurred. For the myriad reasons discussed above, defendant has not shown the jury's verdict of guilty of second-degree murder preponderated heavily against the evidence admitted at trial. *Solloway*, 316 Mich App at 182-183. As a result, the trial court' order denying defendant's motion for a new trial on this ground was not an abuse of discretion. *Lacalamita*, 286 Mich App at 469.

The same is also true of defendant's argument regarding his felonious-assault conviction. As discussed in greater depth above, defendant testified he purposefully turned around to point his gun at Collins II. In other words, his action was not an involuntary reflex, which is the only time the defense applies. *Likine*, 492 Mich at 393-394. Once again, defendant has not identified any "causes outside the record, such as passion, prejudice, sympathy, or some other extraneous influence" as a reason the jury determined he was guilty of felonious assault despite alleged evidence that preponderated heavily in favor of finding defendant's action was involuntary. *Morris*, 314 Mich App at 414 (quotation marks and citation omitted). Instead, defendant relies on different ways of interpreting the evidence presented to the jury. But the jury already considered how to interpret the evidence, and decided defendant intentionally pointed his gun at Collins II. It is not the province of this Court to revisit that decision by the jury. *Lemmon*, 456 Mich at 646. As a result, because the evidence of felonious assault did not preponderate heavily against the jury's guilty verdict, *Solloway*, 316 Mich App at 182-183, it was not against the great weight of the evidence. The trial court did not abuse its discretion when it denied defendant's motion for a new trial. *Lacalamita*, 286 Mich App at 469.

## IV. PROSECUTORIAL MISCONDUCT

Defendant contends prosecutorial misconduct occurred when the prosecutor shifted the burden of proof by asking defendant about why he did not call Mireles-Limones as a witness. We disagree.

## A. PRESERVATION AND STANDARD OF REVIEW

"[T]o preserve an issue of prosecutorial misconduct, a defendant must contemporaneously object and request a curative instruction." *People v Isrow*, 339 Mich App 522, 529; 984 NW2d 528 (2021) (quotation marks and citation omitted; alteration in original). There is no dispute in this case that defendant did not object to any alleged prosecutorial misconduct nor request a curative instruction. As a result, this argument is unpreserved. *Id.*

"Claims of prosecutorial misconduct are generally reviewed de novo to determine whether the defendant was denied a fair trial." *People v Dunigan*, 299 Mich App 579, 588; 831 NW2d 243

(2013). "We review this unpreserved allegation of prosecutorial misconduct for plain error affecting defendant's substantial rights." *People v Anderson*, 331 Mich App 552, 565; 953 NW2d 451 (2020). "To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). To show a defendant's substantial rights were affected, there must be "a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Id*. "Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *People v Randolph*, 502 Mich 1, 10; 917 NW2d 249 (2018) (quotation marks and citation omitted).

## B. LAW AND ANALYSIS

The prosecutor did not commit misconduct warranting reversal when asking defendant why Mireles-Limones was not a witness for the defense at trial. "A prosecutor 'is the representative . . . of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.' " *People v Evans*, 335 Mich App 76, 89; 966 NW2d 402 (2020), quoting *Berger v United States*, 295 US 78, 88; 55 S Ct 629; 79 L Ed 1314 (1935). "We must evaluate instances of prosecutorial misconduct on a case-by-case basis, reviewing the prosecutor's [actions] in context and in light of the defendant's arguments." *People v Lane*, 308 Mich App 38, 62-63; 862 NW2d 446 (2014). "Generally, [p]rosecutors are accorded great latitude regarding their arguments and conduct." *People v Bahoda*, 448 Mich 261, 282; 531 NW2d 659 (1995) (quotation marks and citation omitted).

Defendant specifically argues that the prosecution committed misconduct by shifting the burden of proof. "A prosecutor may not imply in closing argument that the defendant must prove something or present a reasonable explanation for damaging evidence because such an argument tends to shift the burden of proof." *People v Fyda*, 288 Mich App 446, 463-464; 793 NW2d 712 (2010). "Also, a prosecutor may not comment on the defendant's failure to present evidence because it is an attempt to shift the burden of proof." *Id*. at 464. "While the prosecution may not use a defendant's failure to present evidence as substantive evidence of guilt, the prosecution is entitled to contest fairly evidence presented by a defendant" *People v Caddell*, 332 Mich App 27, 71; 955 NW2d 488 (2020) (quotation marks and citation omitted). "Moreover, attacking the credibility of a theory advanced by a defendant does not shift the burden of proof." *People v McGhee*, 268 Mich App 600, 635; 709 NW2d 595 (2005).

Defendant's theory of the case was that he acted in self-defense because he believed the victim was going to shoot him. In support of this theory, defendant called Mireles-Santiago as a witness. She testified that she observed the altercation via a video call she was having with Mireles-Limones when the shooting occurred. This meant, of course, that Mireles-Limones was actually inside of the white SUV when the entire altercation happened. Yet, Mireles-Limones was not called as a witness by the defense. There was no dispute Mireles-Limones was available to testify during trial. On cross-examination, the following exchange occurred between defendant and the prosecutor:

*Q.* So [Mireles-Limones], your cousin who's pregnant, was with you from the time you got to [the victim], through this whole incident, the time you took his gun, and then the time you went back to [Mireles-Santiago's], correct?

*A.* Correct.

*Q.* All right. Where—where does [Mireles-Limones] live?

*A.* I'm not sure.

*Q.* In Lansing?

*A.* I can't tell you. I don't know.

*Q.* Well, your family knows where she lives, right?

*A.* I can't tell you that either.

*Q.* They know her phone number.

*A.* I can't tell you that either.

*Q.* So [Mireles-Limones] could support your whole theory on this and your whole testimony, correct? She was really the only other eyewitness 'cause Horner's like, "I didn't see the shooting," right? The other eyewitness you killed. So there's—

*A.* I killed?

*Q.* –only two eyewitnesses.

*A.* I killed? No, I didn't—

*Q.* You and [Mireles-Limones].

*A.* I didn't kill him.

*Q.* There are only two eyewitnesses. You and [Mireles-Limones], right?

After that interaction, there was a bench conference. The prosecutor did not continue the line of questioning after the conference ended.

Defendant insists this line of questioning violated his right to be presumed innocent and shifted the burden of proof. Defendant claims the prosecutor's questions allowed the jurors to infer that defendant was required to produce evidence of his innocence in the form of testimony from Mireles-Limones. As noted above, defendant is generally correct that a prosecutor cannot shift the burden of proof to the defense. *Fyda*, 288 Mich App at 463-464. Defendant is also correct that such shifting often occurs when a prosecutor comments on a defendant's failure to introduce

evidence during trial. *Id.* at 464. However, defendant has ignored a nuance to the rule, on which the prosecution aptly relies.

In *People v Fields*, 450 Mich 94, 96; 538 NW2d 356 (1995), our Supreme Court "address[ed] the propriety of a prosecutor's questions and closing argument directed to [the] defendant's efforts to produce the woman who [the] defendant testified had actually committed the assault against his wife for which [the] defendant was charged and ultimately convicted." The defendant in *Fields* was accused of nonfatally shooting his wife three times. *Id.* at 96-97. Despite initially admitting to the shooting, the defendant eventually changed his story and claimed his wife had been shot by Joanne Walker, a woman with whom the defendant had been having an affair. *Id.* at 97. The defendant stated he at first wanted to take the blame for Walker because she was pregnant with his child. *Id.* at 98. The defendant decided to testify at trial and relayed the above story. *Id.* The defendant's wife also claimed she had been shot by Walker. *Id.* at 98-99. In light of his allegation of someone he knew being responsible for the crime, the prosecutor, on cross-examination, "twice sought to determine what attempts [the] defendant made to locate Walker." *Id.* at 100 & n 5. The defendant objected, claiming the prosecutor was shifting the burden of proof. *Id.* at 100 n 5. The trial court disagreed, and overruled the objections. *Id.* The defendant was convicted of assault with intent to commit murder, and the defendant appealed. *Id.* at 103-104.

The appeal was ultimately before our Supreme Court, which affirmed the trial court's decision. *Id.* at 96. The Court noted it was particularly relevant that the defendant decided to waive his Fifth Amendment right to avoid self-incrimination and testify at trial. *Id.* at 108-109. "In general, where a defendant takes the stand and testifies in his own defense, his credibility may be impeached and his testimony assailed like that of any other witness." *Id.* at 110 (quotation marks, citation, and alterations omitted). Further, the Court recognized that when a defendant presents an alternate theory of the case, "the prosecution, by commenting on the nonproduction of corroborating alibi witnesses, is merely pointing out the weakness in defendant's case and not improperly shifting the burden of proof to the defendant." *Id.* at 112 (quotation marks and citation omitted). Stated differently, the prosecution's identification of the defense's failure to call a witness that would support his theory "does not cast the burden upon [the] defendant to prove his innocence since [the] defendant cannot be convicted upon the basis that he failed to affirmatively prove his defense." *Id.* (quotation marks and citation omitted). "The circumstantial evidence resulting from [the] defendant's failure to offer evidence and witnesses to support a proffered defense is no substitute for the prosecutor's burden to prove [the] defendant guilty beyond a reasonable doubt." *Id.* (quotation marks and citation omitted). "While [the] defendant is free to offer to the jury a defense supported only by his testimony, the nonproduction of other evidence, known and available to defendant, provides the jury with yet another fact for use to test his credibility." *Id.* (quotation marks and citation omitted). "Stated otherwise, if the prosecutor's comments do not burden a defendant's right not to testify, commenting on a defendant's failure to call a witness does not shift the burden of proof." *Id.*

On the basis of this law, our Supreme Court concluded that the prosecutor in *Fields* did not shift the burden of proof by commenting on the defendant's failure to find and produce Walker as a witness for trial. *Id.* at 118. The Court summarized its decision in the following manner:

> The prosecutor's cross-examination was directed to the weaknesses inherent in the defense theory. The argument presented the factfinder with the

logical inference that [the] defendant's and [his wife's] testimony that Walker had done the shooting was false. The prosecutor did not suggest that [the] defendant had a duty to produce Walker, nor did he argue that [] Walker's testimony would have been adverse to [the] defendant. Rather, the argument asked the factfinder to assess the existing evidence in light of the efforts that were not taken. The prosecutor was not commenting on defendant's failure to produce evidence, but on the evidence defendant did produce—defendant's own testimony.

The prosecutor's argument in this case was not that the defendant had a burden to prove his innocence, but that the testimony of [the] defendant and his wife was not credible because, if Walker did exist, [the] defendant would have made a greater effort to substantiate that fact than sending one letter to the prosecutor's office. [*Id*. at 117.]

The present case can be easily compared to *Fields*. Defendant testified that Mireles-Limones was present during the entire altercation between defendant and the victim. In *Fields*, *id*. at 98-99, the defendant testified another person he knew had actually committed the crimes. In both cases, the relevant person was not called as a witness. Also in both cases, the prosecutor asked about efforts to find the witness. In this case, the prosecutor noted Mireles-Limones purportedly observed everything that occurred, and then asked defendant if he knew where she lived or what was her telephone number. The prosecutor also asked if defendant had a way of finding out, such as asking family members, considering Mireles-Limones was his cousin. The prosecution in *Fields* asked questions about the defendant's efforts to find Walker, other than presenting her alleged address to the prosecutor's office. *Id*. at 100 & n 5.

As in *Fields*, the prosecutor in the present case did not shift the burden of proof. The prosecutor did not question defendant's failure to present evidence or imply defendant had a duty to do so. Instead, the prosecutor used defendant's decision not to call Mireles-Limones as a witness to suggest defendant's theory of the case was not credible. As noted by our Supreme Court in *Fields*, the prosecutor's questioning allowed the jury to infer, if defendant's story was true, that he would have made a greater effort to ensure Mireles-Limones testified at trial. The fact he did not do so brought into question the reliability of evidence he had introduced, which was his own testimony. As a result, the prosecutor did not commit misconduct when asking defendant about his efforts to secure Mireles-Limones's testimony at trial. *Id*. at 117-118. There was no error, plain or otherwise, with respect to the prosecutor's cross-examination of defendant. *Id*.

Because there was no error, defendant is not entitled to reversal for this unpreserved claim under the plain-error doctrine. *Carines*, 460 Mich at 763. Further, even if there was some minor error related to the prosecutor's questions, it did not affect defendant's substantial rights, and did not warrant reversal. *Id*. To show a defendant's substantial rights were affected, there must be "a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Id*. As noted by the prosecution, when the challenged questions were asked, defendant did not directly answer them. The questioning stopped before defendant described his efforts to find Mireles-Limones and ensure she testified at trial. Most importantly, defendant did not testify about why he decided not to call Mireles-Limones as a witness. Any potential prejudice from the prosecutor's questions was minimal. Further, before the jurors began deliberating, the trial court provided them the following relevant instructions:

-19-

A person accused of a crime is presumed to be innocent. This means that you must start with the presumption that the defendant is innocent. This presumption continues throughout the trial and entitles the defendant to a verdict of not-guilty, unless you are satisfied beyond a reasonable doubt that he is guilty.

Every crime is made up of parts called elements. The Prosecutor must prove each element of the crime beyond a reasonable doubt. The defendant is not required to prove his innocence or to do anything. . . . When you discuss the case and decide on your verdict, you may only consider the evidence that has been properly admitted in this case.

\* \* \*

The lawyer's questions to the witnesses and my questions to the witnesses are [] not evidence. You should consider these questions only if they give meaning to the witnesses['] answers.

As is clear from the above instructions, the jury was told the prosecution had the burden of proving each element of the charged crimes, defendant did not have a burden to present any evidence, and the prosecutor's questions were not evidence. "Jurors are presumed to follow the court's instructions, and instructions are presumed to cure most errors." *Ogilvie*, 341 Mich App at 35 (quotation marks and citation omitted). Any minor prejudice caused by the prosecutor's questions was cured by defendant's limited answers and the trial court's instructions. *Id*. Because defendant cannot prove the alleged prosecutorial misconduct affected his substantial rights by altering the outcome of the trial, his argument fails under plain-error review. *Carines*, 460 Mich at 763.

## V. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant, in his Standard 4 brief, argues his trial counsel was ineffective for failing to object to the trial court's decision not to provide an instruction for voluntary manslaughter as a lesser included offense of murder. We disagree.

### A. PRESERVATION AND STANDARD OF REVIEW

A claim of ineffective assistance of counsel can be preserved "by moving in the trial court for a new trial or an evidentiary hearing," *People v Head*, 323 Mich App 526, 538-539; 917 NW2d 752 (2018), or by moving this Court to remand for an evidentiary hearing, *People v Abcumby-Blair*, 335 Mich App 210, 227; 966 NW2d 437 (2020). As described in greater depth above, defendant did move the trial court for a new trial. However, he did not raise any claims of ineffective assistance of counsel in the motion. He also did not move the trial court or this Court for an evidentiary hearing. Consequently, this claim of ineffective assistance of counsel is not preserved for this Court's review. *Id*.; *Head*, 323 Mich App at 538-539.

When preserved, "[c]laims of ineffective assistance of counsel present mixed questions of fact and law." *People v Carson*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 355925); slip op at 7. "Factual findings are reviewed for clear error and legal conclusions are reviewed de novo," and "[q]uestions of constitutional law are [also] reviewed de novo." *Id*. "This

Court reviews unpreserved claims of ineffective assistance of counsel for errors apparent on the record." *People v Spaulding*, 332 Mich App 638, 656; 957 NW2d 843 (2020).

## B.  LAW AND ANALYSIS

Defendant's claim of ineffective assistance of counsel lacks merit.  "A defendant's right to counsel is guaranteed by the United States and Michigan Constitutions, US Const, Am VI; Const 1963, art 1, § 20," and the "right to counsel encompasses the right to the effective assistance of counsel." *People v Muniz*, 343 Mich App 437, 447-448; 997 NW2d 325 (2022) (quotation marks and citation omitted).  "The effective assistance of counsel is presumed, and the defendant bears a heavy burden of proving otherwise." *Id*. at 448 (quotation marks, citation, and alterations omitted). The United States Supreme Court has held that "to receive a new trial on the basis of ineffective assistance of counsel, a defendant must establish that 'counsel's representation fell below an objective standard of reasonableness' and that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *People v Vaughn*, 491 Mich 642, 669; 821 NW2d 288 (2012), quoting *Strickland v Washington*, 466 US 668, 688, 694; 104 S Ct 2052; 80 L Ed 2d 674 (1984).  "When reviewing defense counsel's performance, the reviewing court must first objectively 'determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance.' " *People v Jackson (On Reconsideration)*, 313 Mich App 409, 431; 884 NW2d 297 (2015), quoting *Strickland*, 466 US at 690.  "Next, the defendant must show that trial counsel's deficient performance prejudiced his defense—in other words, that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Jackson*, 313 Mich App at 431, quoting *Vaughn*, 491 Mich at 669.

"This Court will not find trial counsel to be ineffective where an objection would have been futile; nor will it second-guess matters of trial strategy." *Ogilvie*, 341 Mich App at 34. "Furthermore, because the defendant bears the burden of demonstrating both deficient performance and prejudice, the defendant necessarily bears the burden of establishing the factual predicate for his claim." *People v Muhammad*, 326 Mich App 40, 63; 931 NW2d 20 (2018) (quotation marks, citation, and alteration omitted).

Defendant's argument relies on an apparent misunderstanding of the facts of the case or the law.  Defendant asserts that trial counsel should have objected when the trial court decided it would not instruct the jury regarding voluntary manslaughter as a lesser included offense of murder.  However, trial counsel *did* request the instruction for voluntary manslaughter before the trial court instructed the jury.  Trial counsel had already made the argument about why the defense believed the trial court should instruct the jury as to voluntary manslaughter.  Indeed, after the trial court read all of the instructions, trial counsel clarified she approved of the instructions except for her previous challenges.  This, plainly, included the request to read the instruction for voluntary manslaughter.  As this Court has explained, "[a] party must object *or* request a given jury instruction to preserve the error for review." *People v Sabin (On Second Remand)*, 242 Mich App 656, 657; 620 NW2d 19 (2000) (emphasis added).  Because trial counsel's request for the instruction was enough to preserve the issue and forced the trial court to consider it, a later objection would have been cumulative and unnecessary.  Consequently, trial counsel's decision to request the jury instruction desired instead of objecting to the jury instructions was not objectively

unreasonable.  *Id.*  As a result, trial counsel was not ineffective for this reason.  *Ogilvie*, 341 Mich App at 34.

Affirmed.

/s/ Michael J. Kelly
/s/ Kathleen Jansen
/s/ Christopher M. Murray